IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville October 30, 2018

**STATE OF TENNESSEE v. STANLEY OWENS**

**Appeal from the Criminal Court for Shelby County**
**No. 15-03349    Carolyn W. Blackett, Judge**

_____

**No. W2017-02188-CCA-R3-CD**

_____

A Shelby County Criminal Court Jury convicted the Appellant, Stanley Owens, of voluntary manslaughter, a Class C felony, and the trial court sentenced him as a Range III, career offender to fifteen years in confinement. On appeal, the Appellant contends that the evidence is insufficient to support the conviction, that the trial court erred by failing to dismiss the indictment due to the State's almost twenty-five-year preindictment delay, and that trial court erred by disregarding the State's late-filed notice of enhanced sentencing. Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Laurie W. Hall (on appeal) and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Stanley Owens.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Goodman and Sarah Poe, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In July 2015, the State indicted the Appellant for the first degree felony murder of Edward Askew. The indictment alleged that the crime occurred during the perpetration of robbery.

At trial, Vickie Askew, the victim's younger sister, testified that on February 9, 1990, she and the victim were working at their newly-acquired liquor store in Memphis. She explained, "We were in the process of doing a grand opening, and we were kind of stocking the store." Distributors were bringing in displays, and customers were coming in to make purchases. About noon, a man came into the store and was "kind of like stuttering" and "kind of strange acting." He asked for a bottle of Crown Royal that was behind the counter, so the victim turned around to get the bottle for him. By the time the victim got the bottle and turned back around to face the man, the man had pulled a gun on the victim.

Askew testified that the man told the victim to open the "M.F." cash register. The victim reached over the counter to grab the man's gun and fell backward. Askew said she ducked behind the counter and heard two gunshots. The victim was able to get a gun he kept behind the counter, and he ran toward the front of the store. However, the man with the gun "just disappeared." The victim leaned against the front door, slid down, and started bleeding from his mouth.

Askew testified that she called 911. She later gave a statement to the police and looked at some photographs but was unable to identify anyone. In June 2014, she met with Sergeant Joe Stark, who told her that he had "new information." Sergeant Stark showed her a six-photograph array, and she selected the Appellant's photograph and identified him as the shooter. She also identified him at trial as the shooter.

On cross-examination, Askew acknowledged that she was talking on the telephone with her boyfriend when the man came into the store and that nothing about the man's demeanor alarmed her. The man was wearing a baseball cap "[w]ith something like a bandana or a turban or something underneath that," and Askew could not see his hairstyle. She described the man to the police as African-American; thirty-one to thirty-five years old; five feet, ten inches tall; and very slim. She also told the police he had a medium complexion and "gold in his mouth." Sometime after the shooting, Askew was riding around with a friend in South Memphis and saw a man, who looked like the shooter, standing on a street corner. She reported the man to the police but learned he could not be the shooter because he was in jail when the victim was killed.

Askew acknowledged that she testified at the Appellant's preliminary hearing in December 2014. Defense counsel asked her if she stated at the hearing that she was able to identify the Appellant in June 2014 by his eyes. Askew answered, "[T]he face was clearer to me because I didn't have to deal with the hair or the color and all of that. . . . [I]f I said eyes, it might be part of it. But I do remember his face." She acknowledged that in her statement to the police soon after the shooting, she did not say anything about

the shooter's eyes. On redirect examination, Askew testified that when the man came into the liquor store on February 9, 1990, she could see his face "very clear."

Sergeant Joe Stark of the Memphis Police Department (MPD) testified that he worked on solving the Department's "cold" cases. In June 2014, a man named Terry Oliver gave the police information about a 1990 homicide. The information sounded credible, so Sergeant Stark talked with Oliver, who was in federal prison in Alabama. Oliver gave Sergeant Stark "some details that were very interesting." Sergeant Stark began reviewing 1990 cold cases and found one that "matched pretty much" Oliver's information. Sergeant Stark went to Alabama and took Oliver's recorded statement.

Sergeant Stark testified that based on Oliver's information, he put together a photograph array containing the Appellant's photograph and showed the array to Vickie Askew. Askew selected the Appellant's photograph in about ten seconds. Sergeant Stark had the Appellant brought to the police department and asked to see the Appellant's upper thigh. The Appellant pulled down his shorts, and Sergeant Stark began looking for "a bullet hole or a wound of some kind of nature." He found "a round looking scar" on the Appellant's right thigh. The Appellant "volunteered" to Sergeant Stark that he "got shot by a crackhead" and that the bullet was still in his leg. Sergeant Stark checked the police department's crime database for a police report about the Appellant's having been shot but did not find a report. Sergeant Stark stated that hospitals were required to report gunshot wounds to the police but that the database did not contain a report about the Appellant's wound.

On cross-examination, Sergeant Stark acknowledged that when Terry Oliver came forward with his information, Oliver was in federal prison for a drug conviction and was not scheduled for release until 2021. Oliver did not ask Sergeant Stark for a reduction of his federal sentence but wanted to be moved closer to Memphis. One of the details Oliver knew about the liquor store shooting was that the suspect used a forty-four-caliber gun. Sergeant Stark said that a forty-four-caliber bullet was "a very large bullet" and acknowledged that it would cause "a good deal of damage to the human body."

Sergeant Stark acknowledged that Terry Oliver claimed his brother, Carnell Oliver, also was involved in the liquor store shooting. Carnell Oliver died sometime after the shooting, but Sergeant Stark was unable to find out exactly when he died. The last record Sergeant Stark found for Carnell Oliver was in 1995, nineteen years before Terry Oliver came forward. Sergeant Stark acknowledged that although Terry Oliver claimed he was not involved in the victim's death, he knew "an incredible amount of detail" about the crime.

- 3 -

Sergeant Stark acknowledged that the Appellant was in federal prison in December 1992. He also acknowledged that at that time, there was no record of the Appellant's having a gunshot wound. Sergeant Stark stated, "[W]hether he did or not, I don't know." Sergeant Stark checked only Shelby County for a report about the Appellant's possible gunshot wound. A white cap was collected from the liquor store after the shooting and was sent to the Tennessee Bureau of Investigation for testing, but the cap did not contain enough DNA to obtain a profile. Officers also were unable to obtain fingerprint evidence from the crime scene that linked the Appellant to the shooting.

Terry Oliver testified that in February 1990, he was seventeen years old and had an older brother named Carnell. Terry and Carnell[1] knew the Appellant, who was married to their cousin. Carnell died of an aneurysm sometime in the 1990's when Terry was twenty-three years old. Terry sold drugs and spent time in federal prison in Alabama. While he was in prison, he contacted the police and reported that he "knew something about a murder off Lamar." Terry was put in contact with Sergeant Stark, and Sergeant Stark met with Terry in prison.

Terry testified that he told Sergeant Stark the following: The Appellant told Terry that he went into the liquor store, that a man reached for his pistol, and that the pistol "went off." The Appellant was shot in the leg, and the man was killed.

Terry testified that Carnell was the getaway driver and that Carnell's wife owned a blue Toyota and a red Toyota. The day after the shooting, Terry saw a report about the victim's death on the news. Terry stated, "I knew who did it because I had went over that evening and took [the Appellant] some antibiotics and pain pills." The Appellant did not go to the hospital and treated his gunshot wound at home with peroxide, witch hazel, penicillin, and pain pills.

Terry testified that he gave Sergeant Stark all the information he had about the shooting and that he told Sergeant Stark about the wound to the Appellant's leg. Terry asked Sergeant Stark if he could get "a time cut" on his federal sentence, but Sergeant Stark "wasn't for sure about that" and could not promise Terry anything. Terry ended up having his sentence reduced by almost three years. At the time of the Appellant's trial, Terry was out of prison and on supervised probation.

On cross-examination, Terry testified that in 1990, Carnell was thirty-five years old and about five feet, ten inches tall. On the night of the shooting, Carnell told Terry to

---

[1] Because the witness and his brother share a surname, we will refer to them by their first names for clarity. We mean no disrespect to Terry Oliver or his brother.

take some antibiotics and pain pills to the Appellant. Terry went to the Appellant's apartment, and the Appellant told Terry that the victim had reached for the Appellant's gun. Terry knew a forty-four-caliber Bulldog had been used in the shooting because he had seen the Appellant with the gun previously. Terry continued to go to the Appellant's apartment every day for a couple of weeks to treat the Appellant's gunshot wound.

Terry testified that in 2014, he was serving a 121-month federal prison sentence for selling heroin. Prior to being sentenced, he gave information to a United States attorney in exchange for help with his sentence. He did not tell the attorney anything about the Appellant or the victim. In fact, Terry never revealed anything about the Appellant until he talked with Sergeant Stark in 2014. By that time, Terry had served a couple of years in federal prison. He acknowledged that he did not want to be in prison in Alabama and that he would "do what [he] had to to try to come home." Terry said he did not reveal the Appellant's involvement in the shooting earlier because he did not have a reason to do so. He denied being at the liquor store during the shooting.

Dr. Richard Harruff testified as an expert in forensic pathology that he worked for the Shelby County Medical Examiner in 1990. Photographs taken during the victim's autopsy showed a large-caliber bullet wound in his back. Dr. Harruff said that by "large caliber," he meant ".38 or greater." The victim's cause of death was a gunshot wound to the back.

Tim Cook testified that he was retired from the MPD but that he was a sergeant in the Homicide Bureau in 1990. On February 9, 1990, Sergeant Cook responded to a shooting at a liquor store on Central Avenue. At first, the police were looking for a small, blue car. However, after speaking with witnesses, the police learned the car may have been a Nissan Pulsar or Toyota Celica. Two shots had been fired at the scene, but the police never found a second bullet strike or a second bullet. Therefore, they assumed the suspect had been shot. The police began checking all of the hospitals to see if anyone had come in with a gunshot wound.

On cross-examination, Sergeant Cook acknowledged that during his investigation of the case, he received an offense report and an arrest report for a man named Ronald Stewart. According to the reports, the police arrested Stewart for aggravated assault on February 10, 1990. At the time of Stewart's arrest, he was in possession of a forty-four-caliber pistol that contained one live round and one spent round.

At the conclusion of Sergeant Cook's testimony, the State rested its case. The Appellant did not present any proof, and the jury convicted him of voluntary manslaughter as a lesser-included offense of first degree felony murder. After a

- 5 -

sentencing hearing, the trial court sentenced him as a Range III, career offender to fifteen years in confinement.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support his conviction of voluntary manslaughter because Vickie Askew's identification of him as the shooter nearly twenty-five years after the crime was unreliable; Sergeant Stark relied on information from Terry Oliver, a known drug dealer who "sat" on his information for twenty-five years; Oliver waited nineteen years after his brother's death to provide information about the crime; Sergeant Cook never found a medical record for the Appellant's having been shot in the leg; and the police arrested a man the day after the shooting who was in possession of a forty-four-caliber pistol that contained one spent round and one live round. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting

Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a).

Taken in the light most favorable to the State, the evidence shows that on February 9, 1990, the Appellant went into the liquor store and pulled a gun on the victim while the victim had his back turned to the Appellant. When the victim turned around and saw the gun, he reached for it and fell backward. The Appellant fired two shots in the melee: one struck the victim's back, and the other struck the Appellant's right thigh. After the shooting, the Appellant fled the scene and treated the wound himself with help from Terry Oliver. Although more than twenty-four years elapsed from the shooting until Oliver accused the Appellant of being the shooter and Vickie Askew identified the Appellant from a photograph array, the defense thoroughly cross-examined the State's witnesses. The jury, as was its prerogative, accredited the witnesses' testimony and resolved any inconsistencies in favor of the State. Thus, the evidence is sufficient to support the conviction.

## B.  Preindictment Delay

The Appellant contends that the trial court erred by refusing to dismiss the indictment "due to the time elapsed between the commission of the crime and the indictment." The State argues that the trial court properly refused to dismiss the indictment. We agree with the State.

Although the victim was killed in February 1990, the Shelby County Grand Jury did not indict the Appellant for first degree felony murder until July 2015. On March 18, 2016, the Appellant filed a pretrial motion titled "MOTION TO DISMISS FOR VIOLATION OF RIGHT TO SPEEDY TRIAL." In the motion, the Appellant cited case law for speedy trial analysis but argued that the trial court erred by refusing to dismiss the indictment because "[d]efense witnesses have become impossible to locate given the delay in indictment. Therefore, a viable defense has become impossible to sustain."

The trial court held a hearing on the motion on May 11, 2016. A transcript of the hearing is not in the appellate record. However, on September 1, 2016, the trial court filed an order denying what the trial court referred to as the Appellant's "motion to dismiss for delay in bringing an indictment." In the order, the trial court stated that the Appellant "believes that his rights to a speedy trial have been arguably violated." The

trial court noted that Sergeant Stark testified at the motion hearing, and the trial court recounted, in detail, Sergeant Stark's testimony at the hearing. In denying the motion, the trial court stated that "the most important factor in speedy trial analysis is whether the Defendant has suffered prejudice as a result of delay" and found that the indictment in this case should not be dismissed.

Initially, we note that the State argues that the Appellant has waived this issue because he failed to include a transcript of the motion hearing in the appellate record. It is the Appellant's duty to prepare a fair, accurate, and complete record on appeal to enable meaningful appellate review. Tenn. R. App. P. 24(a). However, we believe the trial court's order denying the motion provides us with an adequate record for review of the issue.

That said, the Appellant and the trial court apparently confused the issues of speedy trial and preindictment delay. The Appellant referred to a "speedy trial" violation in his pretrial motion but then argued in the motion that he was prejudiced by the length of the delay between the commission of the crime and the indictment. Although the trial court's order referred to the Appellant's pretrial motion as a motion to dismiss for delay in bringing an indictment, the court then addressed the issue as a speedy trial violation, noting that the most important factor in speedy trial analysis was prejudice to a defendant. See State v. Simmons, 54 S.W.3d 755, 760 (Tenn. 2001) (stating that the most important consideration in speedy trial analysis is the prejudice factor). As he alleged in his pretrial motion, the Appellant alleged in his motion for new trial that the trial court erred by failing to "dismiss this indictment due to the time elapsed between the commission of the crime and the indictment itself." Likewise, the Appellant contends in his appellate brief that the trial court erred by refusing to dismiss the indictment due to the time that elapsed between the victim's death and the filing of the indictment. Therefore, we will address the issue as one of preindictment delay, not speedy trial.

We review a trial court's ruling on a motion to dismiss the indictment for an abuse of discretion. State v. Harris, 33 S.W.3d 767, 769-70 (Tenn. 2000). Generally, to establish a due process violation stemming from a preindictment delay, an accused must prove the following prerequisites, also known as the Marion-Dykes test: (1) there was a delay; (2) the accused sustained actual prejudice as a direct and proximate result of the delay; and (3) the State caused the delay in order to gain a tactical advantage over the accused or to harass the accused. State v. Utley, 956 S.W.2d 489, 495 (Tenn. 1997) (citing United States v. Marion, 404 U.S. 307, 324-25 (1971), and State v. Gray, 917 S.W.2d 668, 671 (Tenn. 1996)); see also State v. Carico, 968 S.W.2d 280, 284-85 (Tenn. 1998).

- 8 -

Here, there was a delay of twenty-five years between the commission of the crime and the indictment. However, while the Appellant contends that he was "greatly disadvantaged due to all the years that passed by and defense witnesses [were] impossible to locate," he has offered no examples of actual prejudice caused by the delay. He also has offered no evidence that the State caused the delay in order to gain a tactical advantage over him or to harass him. Instead, he states that "the only reason for the delay appears to be not having enough proof for an indictment until almost 25 years after the committed crime." Accordingly, we conclude that the trial court did not err by refusing to dismiss the indictment.

## C. Enhancement Notice

Finally, the Appellant contends that the trial court erred by disregarding the State's late-filed notice to seek enhanced punishment for his being a career offender. The State concedes that it did not timely file its notice but argues that the Appellant is not entitled to relief because he failed to request a continuance before trial and has failed to show that the late-filed notice caused any prejudice to his trial strategy or preparation. We agree with the State.

Tennessee Code Annotated section 40-35-202(a) provides that "[i]f the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial." Similarly, Tennessee Rule of Criminal Procedure 12.3(a) provides:

> Written statements of the district attorney giving notice that the defendant should be sentenced to an enhanced punishment . . . shall be filed not less than ten (10) days prior to trial. If the notice is filed later than this time, the trial judge shall grant the defendant, upon motion, a reasonable continuance of the trial.

The statement "must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions." Tenn. Code Ann. § 40-35-202(a). The notice "provides defendants with fair notice of their exposure to enhanced sentencing, orders plea-bargaining, enables defendants to make informed decisions before pleading guilty, aids defendants in developing trial strategy and preparing for sentencing hearings, and assists defendants 'in evaluating the risks and charting a course of action before trial.'" State v. Patterson, 538 S.W.3d 431, 438 (Tenn. 2017) (quoting State v. Adams, 788 S.W.2d 557, 559 (Tenn. 1990)).

"If notice is filed up to the first day of trial, a defendant must request a continuance to preserve his objection to the sentence enhancement." State v. Williams 558 S.W.3d 633, 640 (Tenn. 2018) (citing State v. Stephenson, 752 S.W.2d 80, 81 (Tenn. 1988)). "Generally, if notice is filed late or is filed timely but is otherwise defective, the defendant must show prejudice before the notice will be rendered ineffective." State v. Carter, 121 S.W.3d 579, 585 (Tenn. 2003). However, "[i]f a notice document is so defective as to amount to no notice at all, then the State has not met its burden, and the defendant does not have to show prejudice." Williams, 558 S.W.3d at 640. We review the sufficiency of the State's notice to seek enhanced punishment de novo with no presumption of correctness. Id. at 639.

Here, the State filed a written "NOTICE OF SENTENCING STATUS" on September 8, 2017. The Appellant's trial began three days later on September 11, 2017. He did not request a continuance. At sentencing, the Appellant asked for a three-year sentence as a Range I, standard offender because the State's notice was not timely. The State argued that the trial court should sentence the Appellant as a Range III, career offender because the Appellant failed to request a continuance. The trial court agreed with the State.

On appeal, the Appellant claims that he did not request a continuance because the trial had been set "for some time" and because "the very act of requesting a continuance is prejudicial itself to the accused, especially given this Appellant's age and ill health." However, the record reflects that on September 8, 2016, the Appellant filed a motion to continue the trial, which had been set for October 17, 2016. The trial court apparently granted that motion. Moreover, the Appellant has failed to show that he was prejudiced by the timing of the State's notice. Accordingly, he is not entitled to relief.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 10 -